The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We are particularly happy, before we begin argument, to recognize the 24 students and teacher, Erin Laser, from the West Point High School's government class, who will be observing the arguments in the first three cases. And I understand that this is a tradition that's been going on for many years. In fact, I think that some group, I've been in the Court when you've come before. Those people are graduating. They're probably on the Fourth Circuit now. Anyway, we welcome you and we're happy to hear arguments in the case. Our first case is Johnson v. Holmes. Mr. Fogle. Thank you, Judge. May it please the Court. My name is Jeffrey Fogle. I represent the plaintiff appellants in this matter. The issue of racial profiling has been a very vexing one for our country, socially, politically, and also legally. We know certainly, at least since Wren, that considerations of race in the enforcement of the law can violate the Equal Protection Clause, even when the underlying law enforcement action may otherwise be constitutional. As applied to this case, of course, it means that though the trial court found that there was qualified immunity on the issue of the Fourth Amendment, that there was still a viable cause of action for denial of equal protection. Now, we also know that equal protection in its normal terms... Why did this case switch judges? Because Judge Conrad got sick. Okay. That's what I understand. I got no official notice, but that was the word. Was that the only...? Yeah. I was just curious about that. So, we know from equal protection law that two things need to be proven by a plaintiff. Number one, discriminatory intent. And number two, discriminatory impact. Now, in this case, as has already been mentioned, we had the opportunity actually for two opinions by two Difference to Court judges on some of the very questions before the court. And so, both judges found that there was sufficient evidence on the summary judgment motion and at the end of the plaintiff's case to get to the jury on the issue of discriminatory intent on the part of the defendant. So, the issue became the issue of how does one prove discriminatory effect on the affected population. On your statistics at JA 77, does this show traffic citations only or is it all summonses? My understanding, although it doesn't say so on here, these were just traffic summonses. Okay. These are traffic citations? Pardon? These are traffic citations? Yes, ma'am. So, they would have been similarly situated to the appellants here. That's our point. And you said it was your understanding that they're traffic citations. Do you know — where do you get that understanding? Is that what you requested and this is what they gave you? Well, we requested were traffic summonses and traffic stops. Are summonses and citations the same thing? I believe so. I don't think citation has a technical word that is used in the law. Summons it clearly does. Yeah, but what I'm doing is comparing JA 74 and JA 77. Right. 74 talks about summonses and 77 talks about citations, and that's why I want to know if they're the same thing. As far as I know, they are, but there's nothing in the record to indicate that. But it's only for traffic violations. It's not for any other — it's not assault or anything like that. Correct. It's all traffic, alleged traffic violations. Traffic citations or traffic violations, and they're all the same. Traffic summonses. Yeah. I mean, we're not able to capture warnings, for example. No, I understand, but we have two questions. Are they all for traffic? Yes, ma'am. And the second question is, are citations and summonses the same? And you're saying, yes, it is all for traffic, and yes, they are the same. I thought you said you didn't know. I'm a little less confident about my second answer. I understand that citations and summonses mean the same thing. You understand they're the same. Yes, I couldn't swear to it. But you can't say they're the same. What did you ask for? I asked for traffic summonses. Traffic summonses? Yes. In fact, I have the request here. Is the request in the record? No. Okay. So why isn't the officer that's involved in the list on page JA77, I think it is? Because we asked for a list of all other officers who worked the same sector. So this was all other officers, aside from the defendant in this case, who worked the same sectors. So you could compare what they were doing as opposed to what he was doing, which appears to be a statistical outlier. Yes, ma'am. Indeed. But the JA77 sites are for people that worked two sectors, right? First and second. Yes. The JA74 seems to be for him, and he's working three sectors. Is that wrong? I'm sorry. See, I need help. I mean, I remember the record of what he said, so let me look at what you're looking at. I'm sorry. What was your question? My question was, did the officer that is the defendant here, did he work in three sectors, one to three? Well, as I understand his testimony at trial, he principally worked in sector one, but also worked in sector two and sector three. These other officers just worked in one and two, right? The ones that are in JA77. For this chart. I mean, they may have worked other sectors, but we only asked for their work in this particular area of time. One and two. Yes. But you didn't ask for three? No. Well, why didn't you? If the man that you were worried about worked in three sectors, why not ask for information for the same three sectors? I should have, but the initial information we had was that he principally worked in sector one. I see. Sector one and sector two we've identified by demographics as well, and we've also pointed out under the census tract, once you go further north, you diminish the number of African Americans in the population. So all that would do, if it were higher there, would lend credence to the plaintiff's argument. I don't think it's a necessary element, though. So you're saying district three is further north? Yes. And that he principally worked sectors one and two, which is precisely why we asked for sectors one and two. By further north, you mean going north on Route 29? Precisely, yes. North of Charlottesville? Yes. Out of town? Well, it's north and west of Charlottesville. More into the country. More into the country. So as I was saying, we had the benefit of two opinions on this very question. One, Judge Conrad, who found the statistic was sufficient to prove a trial effect, subject, of course, to being rebutted by the defendant. And then Judge Moon, just before trial, ruled on a motion in Limine that the statistics could not be used for the purpose of proving effect. Okay. So you had two cases going on. You had the Johnson-Kennedy case, and then you had the Hubbard's case. Yes. Did you make different discovery requests, or did you just use the information you'd gotten in one case in the other? Well, there was some independent information in the Hubbard case that was particular to the top of Mr. Hubbard. So to that extent, it was different.  You didn't make a separate request. Okay. And that's why we agreed to consolidate them, because the issue was the same, and it would save everybody time to have it resolved at once. Did you ever request a racial breakdown of Officer Holmes' traffic stops? No, because we were told that they don't record traffic stops, only summonses. Okay. And that goes back to my question of what is a summons vis-à-vis a traffic stop? It's a means of initiating the criminal proceeding. Are they the same thing, in other words? Yes. A traffic stop and a summons. No. You could be stopped and not given a summons. You could be stopped and be given a warning. Wait a minute. They wouldn't give it anything, or they were given a warning or something like that? We don't know. All we know is we were told we don't keep track of stops, of the reason for stops. Is there evidence that they stop people and don't give them any paperwork? It has to be, because we have 1,200 traffic stops between 2009 and 2015, and half that many summonses were issued. Sometimes they just let you go with a warning. Yes. Or sometimes it was a mistake. I mean, the officer may have reasonable grounds to stop you and then realize, looking at it closer. Do you know why the Hubbards were stopped? Well, why my client says they were stopped or why Mr. Holmes says they were stopped? Both. Okay. It's a little confusing. Mr. Holmes says that he drove by Mr. Hubbard and Mr. Hubbard slowed down. He felt he slowed down excessively and, therefore, was suspicious. I slow down when I see police cars all the time. Well, he acknowledged that but said this was especially slow. So he thought it was suspicious. But he went ahead nonetheless, and he stopped further down the road. This was also on 29 near, as you're approaching from the south into Charlottesville. And he was going by when he had his radar on, and he said his radar clocked him at, I think it was 60 in a 55. And so he decided, based on that and based on his suspicions from before, he would stop him. Now, again, according to my client, he was doing it. Yes, he slowed down, as most people do. Then why did he put him in handcuffs? That's another question. Well, there's a long video. 60 in a 55, I've done worse, and they didn't put me in handcuffs. Well, I've watched the video of the stop, and I can explain it to you what the officer, you know, what happened at the stop. He was standing across from my client, and he said, why did you pull your right leg back or your left leg back? He said, what are you talking about? I said, well, when somebody pulls their leg back, that means they're getting ready to throw a punch. So your client was out of the car? Yeah. He had him get out of the car? Yeah. For 55 and a 60, he had him get out of the car? Well, he says that he smelled marijuana when he came onto the driver's side. He also made the 75-year-old mother get out of the car and sit in the police car. So that's why the officer said he put him in handcuffs, because he was a danger. My client pointed out. Because he moved his leg? Because he moved his legs in a particular way. But my client pointed out he was left-handed and therefore would have moved his legs in just the opposite way that the officer thought if he were threatening him. I'm sorry. I have to go back to these statistics. The header on the statistics involving homes talk about traffic stops. And I thought that your answer to our question was that they couldn't tell you traffic stop information. Only the number. Not the reason. Not the reason or the outcome. So that this number of traffic stops by year for the officer, Officer Holmes, is – includes other things. Is that what you're telling me? Other than – I don't know. You said it's – He stopped 1,200 cars. You said that they told you that they couldn't tell you what – I thought you had said earlier. I guess I could get the transcript. That they couldn't tell you traffic stops. That's why the thing that's on JA-77 doesn't say traffic stops. It says citations. Well, I apologize if I misspoke. Okay. Sorry. I'll try to listen better. Tell me. Between us, we should get there, right? Yeah. These – we have information about stops because officers have to call into dispatch whenever they stop. That's the only information we have are the numbers that are reflected here on page 74 of the appendix. Okay. But what are the things that are on 77 then? Well, those are citations and summonses. And, again, okay, I'll just say they're summonses. They are traffic summonses. How do they relate to traffic stops? They're the – what initiates the legal proceeding charging somebody with violating the traffic law. Are they – so let me see if I – so on JA-74, the top chart is the number of stops that were made. And the second chart is the number of stops that resulted in a summons. Yes. So you see, like, 2009, he made 151 stops but only issued 112 summonses. And then when you compare that to JA-77, these aren't the stops. These are just the summonses. So this is more comparable to that second chart, number of summonses issued by year, than it is number of traffic stops because number of traffic stops doesn't appear to be on JA-77, is it? Correct. Okay. So it's your representation to us that summonses equal citations. Yes. The same figure. Exactly. So if we had this officer in the table on JA-77, which I don't know why you didn't have him on the table, but the figures would be the same as they are on JA-74. Yes, ma'am. Okay. I think that's my time. Yeah, but you'll have a little time on rebuttal. Thank you. May it please the Court, my name is Jim Gwinn and I represent Andrew Holmes. You can tell that we're very interested in these statistics. And I have a feeling this morning I wish I had studied math a lot harder. Well, you don't have to. You have to have some knowledge of the Albemarle County Police Department. You must have more than I do, so maybe you can bring that knowledge to bear. Okay. I would begin by pointing out that the only evidence that's in the record as far as what these statistics represent is from Mr. Holmes' cross-examination in which he said on page 154 of the appendix, there's no way to tell from that information how many different individuals I dealt with or issued summons to. There's also no way to indicate how many of those summonses came from traffic stops or how many traffic stops there were involved in these summonses or whether there were calls for service or anything else. So it may not be in the record here on appeal, but somewhere in the record below, there is appellant's request to your client and this is what your client responded. So if we look at that request, we can understand what they were responding to. I would only clarify by that, Your Honor, by saying the county replied to that information in my client's, Mr. Holmes. So he didn't compile the information himself. So it may not be as. . . I think that he stuck with the county's information. I don't disagree. I'm just saying as far as in answering the question. . . To the extent that his answers are inconsistent with what the county. . . But he's stuck with whatever the county came up with, isn't he? But the problem is that what the county came up with, Your Honor, doesn't distinguish, as he said, between which ones were traffic stops, which ones were calls for service. What information were you asked for? Going back to my colleague's question. As I recall, we were asked for a variety of information. Well. . . With regard to it, and one of them was traffic stops. That's written down somewhere, right? Right. We can find that. You can find it. Not in this record right now, but they can supplement it. It is not in this record. It's not in the record? Correct. But was it in the record below? No. Discovery's not anywhere. . . It's not filed. It's not in the record in this case? Not that I'm aware of. The only way that Discovery. . . And you're saying it's not in the record? Right. The only way that it would have been in the record would have been by motion, which would have added it to the motions for summary judgment or opposition to them. And I think what was added was simply as exhibits, the statistics, not the requests. Well, can you make a representation to us that your colleague has misrepresented what was requested of you? He says he requested the information that he needed. He was comparing apples to apples, even though the county seems to make summonses and citations put those different terms in. He says one equals the other. Is that incorrect? I don't think that's incorrect. I think that summonses and citations are the same for. . . It's two different words for the same thing, and that is. . . They're synonymous. For writing a ticket. That's helpful to me. Basically, that's writing a ticket. Would it include warning tickets, too? I don't believe Avonmaw does warning tickets. So if they just let you go with a warning, there's no documentation. Correct. Which is why there's a difference between the number of stops and the number of summonses on JA-74. Yes, Your Honor. Okay. So how is it you suggest that appellants in their position prove cases like this if not through statistics? Well, I'm not suggesting that they can't do it with statistics. What I am suggesting, Your Honor, is that the statistics have to be more transparent and more detailed than what we have here. I mean, basically what the. . . Well, that's the county's problem. So the county's in control of whether somebody could bring a lawsuit against them and their officers. The more vague they are in the statistics that they keep, the more beneficial it is to them to be able to do whatever they want and not be held to account for it. I beg to differ with you, Your Honor. The plaintiff never requested any of the underlying summonses. And what could have been done was that those summonses themselves had been analyzed by someone. One of the things that has been a hallmark in federal litigation with regard to statistics is there's almost always an expert who comes in and analyzes them. What the plaintiff is asking us to do in this case is to say, here is an officer whose statistics are different than other officers and whose statistics are different from the demographics of the location, and that's my prima facie case. If appellants would have had an expert with regard to the statistics, you'd have been fine with that? Well, I don't know that I would have been fine with it from that standpoint. I think what I would have been is hard-pressed and I would have had to put an expert on of my own to explain why it was that these statistics didn't mean what their expert was saying. See, the problem is the Supreme Court has said that somebody, a given person, can make out a cause of action here. And it seems like whatever it is that you say here means that they can't. As my colleague said, if the county keeps bad statistics, then that's too bad for the plaintiff. And that really can't be the law. I mean, you know, if the Supreme Court said you can make a case, you should be able to posit some way that they could make a case, even though, of course, you're saying they didn't here. Let me give you an example, Your Honor. One of the things that would have been helpful would have been if the plaintiff had asked for information and said, okay, how many of these were calls for service? And by that I mean, how many of these summonses or citations were issued by Officer Holmes because he was specifically called to a location that something happened? For example, if he's called to investigate an accident, he doesn't have discretion there. Whoever has caused the accident gets the ticket. It's not a question of discretion in those situations. If this case goes to trial, I assume your client would come up with all these calls of service and put it in the record in his defense, right? If the plaintiff asked for them, Your Honor, but it's not our burden to prove. And so from that standpoint, when the plaintiff says, I mean, from the very beginning, we took the position, and it was no secret, that this bare statistics by themselves would not prove the case. And so if you went to trial, you would just stick with the bare statistics and argue those? You wouldn't use what you're talking about now to defend your client? If this court said that the bare statistics are sufficient to reach the jury, then I would certainly come up with more information from a statistical analysis standpoint. So then he didn't need to ask for them. You're going to get them anyway. This calls to service.  I mean, he has the burden of coming forward with that. It's not my burden. It's not that Mr. Holmes' burden. No, but he's going to put on his case, and then… If all he's going to put on in his case, and obviously through discovery we knew what that was, is the bare statistics that show that there's a discrepancy, I certainly am not going to do any more than that unless this court tells me that's sufficient, because I don't want to prove his case for him. I'm not, you know, that's, from an adversarial standpoint, that's not where I want to be. Right. Along the way, a few minutes ago, you started talking, you put in, you said something like you can't tell whether these citations, which are in fact the same thing as summonses, involve traffic stops. Is that right? Involve a traffic offense, I guess. Correct. That, based on the information that's written on the sheets, you can't tell that. Officer Holmes couldn't tell that at trial. He was asked questions about them, and his answer was, I don't know what the, I have not seen these documents, I don't know what they are. Yes, but as a matter of course, are you saying that summonses, which are the same thing as citations, are issued for things other than traffic stops? Yes, ma'am. The summonses are issued for misdemeanors, Class I and II misdemeanors. They are issued, for example, nuisance or whatever, some sort of low-level misdemeanor. But as a result of a traffic stop? No, Your Honor. Well, they asked you only about traffic stops in the discovery request. That's why this JA-74 is about traffic stops.  They asked us about all the summonses issued by the Department, and those summonses include misdemeanors. They didn't ask just traffic stops. I thought you, I thought. Well, one of the things says traffic stops. I thought opposing counsel said that's what he asked for when I asked him is this just traffic stuff as opposed to assaults or drugs or anything else. He said that's what he asked for. And you said his representation as to what he asked for is accurate. But he also, he had more than one request in his discovery request, Your Honor. And his interrogatory is a request for production. I thought we didn't know what he asked for. I thought we didn't know what he asked for. It's not in the record. I agree. I don't recall it at this point because in going back and studying the record, it's not in there. But these could be two different things on page 74 then, traffic stops and summonses. There could be summonses that didn't have anything to do with the traffic stop. Yes, Your Honor. All right. That's your representation that there are two different things? It's not just 600 out of 1,200 because we don't know whether it had to do with the traffic stop or not. No, that doesn't make any sense. But, okay, I just want to be sure I understand that that's your representation to us, that the number of summonses are not a fraction of the number of traffic stops. Even though they're on the same page, they're lined up together, they look like one is derivative of the other. And opposing counsel said that's what he asked for. My representation to you is I don't know that they are. I have not looked at each of them. Well, it says Albemarle County Police on the top of the page. They have a computer that goes through and that's what. And you're representing the Albemarle County Police, aren't you? In this case, I'm representing Officer Holmes. Okay. Albemarle County has been dismissed. I represented them during the case. And you were representing them when this was put in the record? Yes, when we did this discovery, I certainly was, Your Honor. You were representing them when this document on page 74 was created? Yes, Your Honor. All right. And my understanding of that document was that they have a computer program that tallies all this. No, and we understand. Look, I represented states and local governments for a long time. And you have to kind of talk to the client because they're not used to responding to litigation requests. And I had thought from representation by your colleague that the number of summonses was a fraction of the number of traffic stops. And that's the way this piece of paper is lined up. That's the way it reads. But if you tell me that's not. I mean, I understand you haven't gone back and looked at everyone. But you talked to your client. You know what they put down. You haven't verified that, I assume. I'm trying. Okay. The best way to put it is that there's not a summons for a traffic stop that's not represented in the traffic stops. In other words, there has to be a stop before there's a summons for traffic stops. Right. However, what I can't tell you is whether all of the summonses listed here came out of traffic stops. They could have been calls for service. Oh, that goes back to your calls for service thing. Right, which are apples and oranges. Yes. Which goes back to the entity that creates the apples and oranges problem is the entity that benefits from creating the apples and oranges problem. Because the police are the ones that keep these statistics. The police are the ones that provided these statistics. And then they go to court and say, oh, the statistics are bad. You can't tell anything from these statistics. That can't be right. That's why when I mentioned earlier about having an expert or having some analysis of it, is that you would then go and look at the underlying summonses to determine whether or not. That would be the burden that's on the plaintiff. Okay. That's the burden of proof. Again, about two minutes ago you said, I can represent. And then what was it that you could represent? That there are no traffic summonses issued that are not included in traffic stops. Because, and I'm not trying to be facetious, you have to stop somebody in order to give them the summons. So, like, if we take 2009. Yes. It's just the first. Those 112 are included in the 151. Not necessarily. Okay. Because of the calls for service rate. Because if there's a call for, if there are 12 calls for services, then there were only 100 stops. So he, so the racial disparity then would have been perhaps because of calls for service? They only call him when there's a minority involved? Because the numbers are still messed up. The, I'm not sure I understand. Well, I'm not sure I understand. Neither side had an expert. Correct. Maybe that's the problem here. We've got lawyers trying to figure out what these things mean, and they don't understand the statistics. It's worse than that. You've got a history major lawyer that's trying to figure it out, Your Honor. I mean, you know, that's why I kept thinking throughout the case that there was going to be an expert identified by the plaintiffs. Why didn't you get an expert? Because I, when they didn't. You're the one that furnished these records, what, page 74? Because they had the burden of proof, and I believed in my heart of hearts and still do that they had not proven their case by simply laying the bare statistics. Every case that I've read. Okay, but we've just talked about statistics. We haven't talked about these, what the numbers show. And the numbers look fishy for your client, frankly. Would you not agree with that? I would agree with you that the numbers show, well, the numbers seem to show, I guess is the best way to put it. Okay, I'll accept that. That his arrests are greater than. Disproportionately of minorities. They're higher than the demographics of the area, and they're also higher than other officers. I do agree with that, Your Honor. However, as he testified, the other thing that the summonses don't tell us is we don't know how many people this involves. You could have given five summonses to one person. So, again, we don't know that he stops more. I don't know where that goes, necessarily. So you could give multiple summonses for one stop. You could. So that makes it worse. 112 out of 151. Well, I don't know if it does or not. It could be that he stops the same number of people, and, you know, it happens if there's more. And gives minorities more summonses. Or the other way around. Maybe he stops fewer. Well, the statistics don't show. Okay, so now you're saying he gives the white people he stops more summonses, and still it's skewed. Still the numbers show at least they're fishy. What I'm saying, Your Honor, is that the cause of the plaintiff didn't do what the plaintiff needed to do. Right. I hear that. And we understand that. You're saying you didn't have to represent both sides. Right. And I'm certainly not paid to do that, Your Honor. I'm not going to do that. Can we look at 741 for just one more minute? In 2015, according to your client, the number of summonses were 92. The number, and this is just for the officer for whom you represented, the number that was given to African-Americans was 47, more than half. Doesn't that strike you as like? What's the percentage of African-American population in this county? I think we decided it was 18%. Okay. Your Honor, it might. But for the different sectors, it would be different. It would be. And he's working sector one. And I think that 18% is in that sector. No, he's working one, two, and three. And the others are working one and two. But do you disagree that three has proportionately less number of African-Americans? I went to UVA, so I know sort of the area. I think it has fewer than one does. And I think the explanation for that was there's more rental property and there's more transients with regard to sector one. But, Your Honor, back to your point. Right. The U.S. v. Armstrong case makes it very clear that unless you have evidence that talks about the crimes themselves and whether they are committed more by a particular race than another. And the classic example they give was a sentencing committee study that showed 90% of the crack cocaine arrests and convictions are African-Americans, but 90% of the LSD convictions are Caucasians. So without knowing what these are for. Yeah, but we don't have any statistics like that here. They weren't asked for. We don't have 90% of the drivers that commit traffic violations are African-Americans. All he asked for was summonses. No. I thought you said you didn't know what he asked for. I know that he didn't ask for anything more detailed than this, Your Honor. He never asked for a breakdown of the summonses as to what they were for. It was just simply traffic summonses. In my position. But we don't know really. All we know about what they were asking, what you all are telling us this morning, because you don't have that in the record. Yes, Your Honor. That's exactly right. And both of you are relying on memory, I think. Yes, from several years ago. And I would. And all we're talking about here is disparate impact. Wait. And you've got to prove disparate intent or intentional discrimination, which is hard to prove by disparate impact. And, in fact, this Court has said in the Hare case that these types of statistics are not what you used. I understand that discovery requests and responses aren't filed in the court file. But it doesn't have to just be your memory or opposing counsel's memory. Surely it's in your office file. Sure. Okay. It's somewhere. I'm not suggesting it is. He said by memory, and you said, yeah, you'd have to do it by memory. I'm just saying, no, you don't. You can go look. It's in your office. I can't. But because it's not in the record, I did not prepare by reading the discovery requests in this case. I understand. It's just somewhere written down. Yeah. But, again, without knowing what the particular crimes are or whatever, the plaintiff has failed to carry their burden. And Judge Moon was right when he found that. And you're under no obligation to supplement the record to help the other side. No. I can't. Right. But the other side can supplement the record. They've got it in their office file, too, if they want. I think that's your decision, Your Honor. Thank you very much for your argument. You can even supplement it on appeal, either one of you, if you do it right. Yes. If you had to. Normally we don't do it, but you could. There's a rule with that. We appreciate your argument and your candor with us. Thank you very much. Thank you, Your Honor. If I may address that last question first. And I'm reading from Judge Moon's opinion in which he dismissed the case, referring to the statistics. The data show the racial breakdown of Albemarle County. No dispute about that. A more specific racial breakdown of two sectors of Albemarle County where Holmes worked. No dispute about that figure. Holmes' total traffic stops, which appear on 74. The racial breakdown of the summonses and arrests issued by Holmes. And the racial breakdown of citations and arrests for other officers in Holmes' primary sector for 2015. So I think when you look at the piece of paper, as Your Honors have, obviously, and it notes to start off with, here's a record of the number of traffic stops he made. Then you think, according to the argument being made by the defense, somehow they're going to put in summonses about things that have nothing to do with the heading of the piece of paper. I think we all understand this and we all have a pretty good grasp of 74 and 77. What we don't know is what you asked for. You've made a representation to us about what you asked for. Both of you have told us, I think, that those discovery requests are not in the record and responses to them are not in the record. And so it's pretty hard for us to make any determination with respect to that. It was also suggested when your colleague was arguing that you all could move to supplement the record. But you haven't done that yet, right? But it's not too late, I hope. I'm not sure. You're never going to know unless you make a motion, will you? Or do a little research. I could do a little research, too. I have a question about this. Opposing counsel said, where's the expert? What's your response to you don't have any expert to opine as to what these statistics mean? Well, I don't think you certainly don't need an expert, and Judge Conrad didn't think you needed an expert, to say there are striking differences in the way he conducts his traffic stops and who he cites. But that didn't get you home with Judge Conrad. That would be a fine thing to say if you had won in front of Judge Conrad, but you didn't. But I agreed with him. And I think Judge Moon was wrong in that regard. I think Judge Conrad was right. I mean, these statistics, for example, many people will try to show the discrepancies between the summonses. Well, Judge Moon also noted a disparity. He highlighted that as well. But the disparity that's often raised in equal protection cases is the demographics versus the impact on minorities. Well, we went one step further, which I think is probably the most convincing step, which is to compare it to every other officer who works in the same district. We're not then restricted by what is precisely the right demographic to use. They're both operating in the same demographic. And how do you know to ask about these service calls or did he give five tickets to one person at once? You know, that sort of stuff. I assumed if that was their defense that they would have laid that out in discovery. And there was nothing there. So I think the only thing an expert could have said was the facts, which is he issued twice as many summonses to black drivers. The experts could explain the facts and explain it. You don't buy an expert. I assume we are. It understands statistics and that kind of thing. And in the case, this is an important case. These are important issues. It's talking about equal protection clause of the Constitution. It ought to come up here on a decent record if we're going to address it, it seems to me. We ought to be certain of what the facts are. Well, we do have certainty about the facts. Well, there may not be any uncertainty in your mind, but we are even a step removed from you. And what we rely on is what's in the record. So there's uncertainty in our minds. But I'm trying to address the question of an expert witness here. So an expert witness could have said he issued summonses to twice as many blacks as whites. And that the demographic in that area, he issues three times as many summonses as the demographic. But a jury can understand that. You don't need an expert to understand that. And they get another expert to counter and explain what your expert said. And your expert would get to counter what he says. Exactly. And they were – and we'd have witnesses explaining these things and going back and forth that know what they're talking about. Rather than just the lawyers who aren't experts in statistics and don't even have the requests of what they asked for and don't understand – don't have a mutual understanding of what was asked for and what was produced. Except it wouldn't have made a difference in this case because Judge Moon did not think this type of statistic could prove a fact. Yeah, but he might be legally wrong, but we're not going to know that unless we know what the facts of the case are. And you did try to have an expert who had been a police officer in this area, right? That was the defendant. Yeah, okay. They sought an expert witness. We moved successfully to eliminate that expert witness. They did not address any of the questions that you are asking here today in their report or in my deposition. You said you liked what Judge Conrad said and didn't like what Judge Moon said. Are you saying Judge Moon overruled Judge Conrad? Yes, I think so. Well, then Judge Moon over – you're stuck with Judge Moon's head then. Clearly. That's why I'm here. No, but the Judge Moon's ruling – but there are two cases here being consolidated. Right. No, it is Judge Moon's ruling that we're appealing from. But you all have the benefit of having a second district court judge look at the same set of facts and come to the opposite conclusion. And that's an – well, obviously it's an advantage to the plaintiff in this case, but I think it should be an advantage to the court to have the opinion of two district court judges. And, yes, of course, Judge Moon's decision predominates. He made the final decision, and that's why we're here. In your response to the motion for summary judgment, sometimes in responses to motions, the requests that were – the discovery requests are discussed in there. Sometimes they're set forth. And sometimes, yeah. Do you know whether – can you recall, or you need to look? I do not think it got discussed at all. I don't think it was an issue at that time. I don't think it had been raised as an issue at that time. Well, they certainly didn't say that these statistics showed racial discrimination. So that much of an issue was raised. Yes, but if you read Judge Conrad's opinion, you'll see what they raised. And they didn't raise that. Okay. Thank you very much for your argument. Thank you very much. We will come down, say hello to the lawyers, and then go directly to our next case.
judges: Diana Gribbon Motz, Robert B. King, Stephanie D. Thacker